Case: 1:26−mc−00129
Assigned To : Mehta, Amit P.
Assign. Date : 9/14/2026
Description: Misc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE BONNER GROUP,<br><br>Plaintiff,<br><br>v.<br><br>X CORP.,<br><br>Defendant. | Case No. _____<br><br>Underlying Litigation:<br>*X Corp. v. Media Matters for America*,<br>No. 23 Civ. 1175 (N.D. Tex.)<br><br>ORAL ARGUMENT REQUESTED |

**NOTICE OF MOTION TO QUASH X CORP.'S**
**NONPARTY SUBPOENA OR FOR A PROTECTIVE ORDER**

PLEASE TAKE NOTICE that the Bonner Group, through the undersigned counsel, and pursuant to Federal rule of Civil Procedure 45, hereby moves to quash the Subpoena Duces Tecum issued by X Corp. in connection with *X Corp. v. Media Matters for America*, No. 23 Civ. 1175 (N.D. Tex.), or in the alternative for a protective order to stay enforcement of the Subpoena pursuant to Federal rule of Civil Procedure 26. In support thereof, the Bonner Group submits the following Memorandum of Law, Declaration of Jackson Erpenbach and attached exhibits, and Declaration of Allison Thompson. Upon such evidence and argument as may be presented at any hearing, on the date and time to be determined by the Court, the Bonner Group respectfully requests that the subpoena be quashed or that the Court issue a protective order.

RECEIVED
SEP 14 2026
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Dated: September 14, 2026
Washington, DC

Respectfully submitted,

Amy Jeffress, Bar No. 449258
Jackson Erpenbach, Bar No. 1735493
Rachel Freeh*
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com
jerpenbach@heckerfink.com
rfreeh@heckerfink.com

John C. Quinn*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com

*Attorneys for Nonparty the Bonner Group*

**pro hac vice applications forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE BONNER GROUP,<br><br>Plaintiff,<br><br>v.<br><br>X CORP.,<br><br>Defendant. | Case No. ______<br><br>Underlying Litigation:<br>*X Corp. v. Media Matters for America*, No. 23 Civ. 1175 (N.D. Tex.)<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF THE BONNER GROUP'S MOTION TO QUASH X CORP.'S NONPARTY SUBPOENA OR FOR A PROTECTIVE ORDER**

Amy Jeffress, Bar No. 449258
Jackson Erpenbach, Bar No. 1735493
Rachel Freeh*
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com
jerpenbach@heckerfink.com
rfreeh@heckerfink.com

John C. Quinn*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com

*Attorneys for Nonparty the Bonner Group*

**pro hac vice applications forthcoming*

## TABLE OF CONTENTS


Preliminary Statement .......... 1

Background .......... 2

I. X Corp. Files a "Thermonuclear" Lawsuit Against the Nonprofit Media Matters for Articles It Published After Elon Musk's Acquisition of Twitter .......... 2

II. Musk Encourages Harassment of Media Matters's Donors .......... 5

III. The Fifth Circuit Stays X Corp.'s Discovery into Media Matters's Donors .......... 5

IV. X Corp. Instigates Retaliatory State and Federal Investigations of Media Matters Targeting Donor Identification .......... 7

V. X Corp. Serves Subpoenas on Media Matters's Donors and Fundraisers, Including the Bonner Group .......... 8

Legal Standard .......... 11

Argument .......... 13

I. The Subpoena Should Be Quashed Because It Requires the Disclosure of Privileged Material that Is Irrelevant and Must Be Sought Elsewhere .......... 13

A. The Bonner Group Has Well-Recognized First Amendment Interests at Stake .......... 14

B. The Subpoena Seeks Information Irrelevant to the Texas Action .......... 22

C. X Corp. Can and Must Seek Information Elsewhere .......... 24

II. The Subpoena Imposes an Undue Burden on The Bonner Group .......... 26

III. In the Alternative, this Court Should Stay Enforcement of the Subpoena Pending the Fifth Circuit's Decision on X Corp.'s Similar Requests for Party Discovery .......... 29

Conclusion .......... 30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AF Holdings, LLC v. Does 1-1058*,
752 F.3d 990 (D.C. Cir. 2014) .......... 22, 26

*AFL-CIO v. Fed. Election Comm'n*,
333 F.3d 168 (D.C. Cir. 2003) .......... 12, 15, 16, 17

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .......... 17, 19, 21

*Benham v. Rice*,
238 F.R.D. 15 (D.D.C. 2006) .......... 27

*Black Panther Party v. Smith*,
661 F.2d 1243 (D.C. Cir. 1981) .......... 14, 15

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 17

*Burlington Ins. Co. v. Okie Dokie, Inc.*,
368 F. Supp. 2d 83 (D.D.C. 2005) .......... 12

*Dart Indus. Co. v. Westwood Chem. Co.*,
649 F.2d 646 (9th Cir. 1980) .......... 30

*In re Denture Cream Prods. Liab. Litig.*,
292 F.R.D. 120 (D.D.C. 2013) .......... 12

*Diamond Servs. Mgmt. Co. v. Knobbe, Martens, Olson & Bear, LLP*,
339 F.R.D. 334 (D.D.C. 2021) .......... 12, 23

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 14, 17, 18, 21

*Gouse v. District of Columbia*,
359 F. Supp. 3d 51 (D.D.C. 2019) .......... 26

*Int'l Action Ctr. v. United States*,
207 F.R.D. 1 (D.D.C. 2002) .......... 14, 24

*Int'l Union, UAW v. Nat'l Right to Work Found.*,
590 F.2d 1139 (D.C. Cir. 1978) .......... 15

*Jigsaw Prods., Inc. v. SEC*,
824 F. Supp. 3d 56 (D.D.C. 2026) .......... 24

*In re Kincaid*,
No. 21 Misc. 67, 2023 WL 5933341 (D.D.C. Aug. 9, 2023) .......... 14, 22

*In re Kincaid*,
No. 22 Misc. 67, 2023 WL 6459801 (D.D.C. Oct. 4, 2023) .......... 14, 21

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) .......... 30

*Linder v. Calero-Portocarrero*,
180 F.R.D. 168 (D.D.C. 1998) .......... 27

*Media Matters for Am. v. Bailey*,
No. 24 Civ. 147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024) .......... 7

*Media Matters for Am. v. FTC*,
No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) .......... 8

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) .......... 8

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .......... 8

*Media Matters for Am. v. Paxton*,
732 F. Supp. 3d 1 (D.D.C. 2024) .......... 7

*Media Matters for Am. v. X Corp.*,
No. 25 Civ. 2397, 2025 WL 1084715 (N.D. Cal. Apr. 10, 2025) .......... 4

*Media Matters for Am. v. X Corp.*,
No. 25 Civ. 2397, 2025 WL 1853770 (N.D. Cal. July 3, 2025) .......... 4

*In re Media Matters for Am.*,
No. 25-10630, 2026 WL 2453373 (5th Cir. Aug. 21, 2026) .......... 7

*Mehlhorn v. No Labels*,
No. 24 Misc. 101 (D.D.C. Dec. 23, 2024) .......... 21, 22

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 16

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
641 F.3d 470 (10th Cir. 2011) .......... 21

*In re Musk*,
169 F.4th 447 (4th Cir. 2026) .......... 8, 24

*N.C. Right to Life, Inc. v. Leake*,
231 F.R.D. 49 (D.D.C. 2005) .......... 13, 23, 25, 27, 28

*N.Y. State Nat'l Org. for Women v. Terry*,
886 F.2d 1339 (2d Cir. 1989) .......... 14

*NAACP v. Alabama*,
357 U.S. 449 (1958) .......... 14, 17

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .......... 16

*In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*,
659 F. Supp. 3d 54 (D.D.C. 2023) .......... 13, 28

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) .......... 22

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) .......... 15, 16, 17, 21

*Perry v. Schwarzenegger*,
602 F.3d 976 (9th Cir. 2010) .......... 16

*Phillips & Cohen, LLP v. Thorpe*,
300 F.R.D. 16 (D.D.C. 2013) .......... 12, 22, 25

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) .......... 19

*RNC v. Pelosi*,
602 F. Supp. 3d 1 (D.D.C. 2022) .......... 16, 17, 18

*Stone v. Trump*,
356 F. Supp. 3d 505 (D. Md. 2018) .......... 30

*In re Subpoena to Goldberg*,
693 F. Supp. 2d 81 (D.D.C. 2010) .......... 26

*In re Subpoena to Wang*,
214 F. Supp. 3d 91 (D.D.C. 2016) .......... 30

*In re Subpoenas Served on Am. Acad. of Pediatrics*,
No. 23 Misc. 4, 2023 WL 2351729 (D.D.C. Mar. 3, 2023) .......... 13

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... 16

*United States v. Int'l Bus. Machs. Corp.*,
83 F.R.D. 97 (S.D.N.Y. 1979) .......... 27

*US Dominion Inc. v. My Pillow Inc.*,
No. 21 Civ. 445, 2024 WL 2880425 (D.D.C. June 7, 2024) .......... 23

*Watts v. SEC*,
482 F.3d 501 (D.C. Cir. 2007) .......... 13, 30

*Whole Woman's Health v. Smith*,
896 F.3d 362 (5th Cir. 2018) .......... 22

*Wyoming v. U.S. Dep't of Agric.*,
208 F.R.D. 449 (D.D.C. 2002) .......... 24

*X Corp. v. Media Matters for Am.*,
No. 23 Civ. 1175, 2024 WL 4416887 (N.D. Tex. Sept. 27, 2024) .......... 6, 21

*X Corp. v. Media Matters for Am.*,
120 F.4th 190 (5th Cir. 2024) .......... 6, 7, 21, 27, 29

**FEDERAL RULES**

Fed. R. Civ. P. 26 .......... 12, 22

Fed. R. Civ. P. 26(b)(1) .......... 6, 12, 13

Fed. R. Civ. P. 26(c)(1) .......... 13, 30

Fed. R. Civ. P. 45 .......... 11, 12, 13

Fed. R. Civ. P. 45(d)(1) .......... 12

Fed. R. Civ. P. 45(d)(3) .......... 11

Fed. R. Civ. P. 45(d)(3)(A)(iii) .......... 12

Fed. R. Civ. P. 45(d)(3)(A)(iv) ..... 26

**OTHER AUTHORITIES**

Barak Ravid, *Israel's Netanyahu Asks Elon Musk To Combat Antisemitism on X*, Axios (Sept. 18, 2023), https://www.axios.com/2023/09/18/elon-musk-netanyahu-israel-antisemitism-x ..... 2

Dan Milmo, *Elon Musk Threatens To Sue Anti-Defamation League over Lost X Revenue*, Guardian (Sept. 5, 2023), https://www.theguardian.com/technology/2023/sep/05/elon-musk-sue-adl-x-twitter ..... 2

Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, N.Y. Times (Oct. 27, 2022), https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html ..... 2

Kerry Breen, *100 Jewish Leaders Call Out Elon Musk for Antisemitism on X, Formerly Twitter: "We have Watched in Horror,"* CBS News (Sept. 26, 2023), https://www.cbsnews.com/news/elon-musk-antisemitism-on-x-twitter-jewish-leaders ..... 2

Oral Argument at 18:40, *X Corp. v. Media Matters,* No. 24-10900 (5th Cir. Feb. 18, 2025), https://www.ca5.uscourts.gov/oral-argument-recordings?docket=24-10900 ..... 23

## PRELIMINARY STATEMENT

The Bonner Group is a fundraising firm whose clients include progressive nonprofits and political campaigns. One of its many clients is Media Matters for America ("Media Matters"), a 501(c)(3) nonprofit news organization that over the course of 2022 and 2023 published several articles critical of the changes that Elon Musk made to the social media platform Twitter (now "X") after he purchased the company. In response, Musk directed X Corp. to file a "thermonuclear" lawsuit against Media Matters in the Northern District of Texas asserting state-law claims for disparagement and alleged interference with X Corp.'s advertising relationships. Musk directed the filing of similar lawsuits around the world and also instigated investigations by multiple state attorneys general and the Federal Trade Commission. Court after court—including several in this District—has concluded that this scorched-earth campaign constitutes retaliation against Media Matters for conduct plainly protected by the First Amendment.

In an expansion of this campaign, Musk and X Corp. have now trained their sights on Media Matters's donors and fundraisers, including the Bonner Group. X Corp. first sought this information from Media Matters, but its efforts were put on hold by the Fifth Circuit. Undeterred, on July 27, 2026, X Corp. served a sweeping subpoena on the Bonner Group ("the Subpoena" or "the Bonner Group Subpoena") seeking detailed information about the DC-based Bonner Group's protected speech and association with its donors, clients, and like-minded organizations and individuals. These requests bear no relevance to the Texas-law claims X Corp. is pursuing against Media Matters.

This Court should quash the Subpoena in full for two primary reasons. First, the Subpoena infringes on the Bonner Group's First Amendment privilege not to disclose under threat of contempt its private speech and associational conduct, especially to a party with the expressed intent of weaponizing that information against the Bonner Group and its partners. Second, the

Subpoena imposes an undue burden on the Bonner Group that is not proportionate to the relevance of, or X Corp.'s need for, the sensitive information requested. In the alternative, and at a minimum, the Court should issue a protective order staying enforcement of the Subpoena until the Fifth Circuit rules on X Corp.'s requests seeking the information directly from Media Matters.

## BACKGROUND

The Bonner Group Subpoena is the latest in a long pattern of invasive and facially retaliatory conduct by Elon Musk and X Corp. in an explicit and years-long effort to bully and obstruct not only the nonprofit media organization Media Matters, but also any group or individual that ever chose to support Media Matters.

### I. X Corp. Files a "Thermonuclear" Lawsuit Against the Nonprofit Media Matters for Articles It Published After Elon Musk's Acquisition of Twitter

Musk first announced his intention to buy Twitter, Inc. (now, "X Corp.") in April 2022. The sale closed in October 2022.[1] Leading up to Musk's acquisition, and in the year following it, X Corp. faced criticism from multiple sources about a marked increase in antisemitic and pro-Nazi content on the platform, including criticism that Musk himself had endorsed antisemitic statements on the platform.[2] In the months after Musk's acquisition of Twitter closed, Media Matters, a 501(c)(3) nonprofit organization, published several articles that reported on changes in content on the platform. A November 16, 2023 article reported that "corporate advertisements" from

---

[1] Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, N.Y. Times (Oct. 27, 2022), https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

[2] *See, e.g.*, Kerry Breen, *100 Jewish Leaders Call Out Elon Musk for Antisemitism on X, Formerly Twitter: "We have Watched in Horror,"* CBS News (Sept. 26, 2023), https://www.cbsnews.com/news/elon-musk-antisemitism-on-x-twitter-jewish-leaders; Dan Milmo, *Elon Musk Threatens To Sue Anti-Defamation League over Lost X Revenue*, Guardian (Sept. 5, 2023), https://www.theguardian.com/technology/2023/sep/05/elon-musk-sue-adl-x-twitter; Barak Ravid, *Israel's Netanyahu Asks Elon Musk To Combat Antisemitism on X*, Axios (Sept. 18, 2023), https://www.axios.com/2023/09/18/elon-musk-netanyahu-israel-antisemitism-x.

companies including "Apple, Bravo, Oracle, Xfinity, and IBM" had "appear[ed] on pro-Hitler, Holocaust denial, white nationalist, pro-violence, and neo-Nazi accounts." Ex. 1.[3] The next day, Media Matters published another article showing advertisements for companies including Amazon and NBCUniversal "next to content with white nationalist hashtags." Ex. 2.

In response to that reporting, Musk announced on X on November 18, 2023, that "X Corp will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company[.]" Ex. 3. Minutes later, Musk further promised action against "[Media Matters's] board, their donors, their network of dark money, all of them," Ex. 4, adding that "[t]he discovery and depositions will be glorious to behold," Ex. 5. On November 20, 2023, X Corp. made good on Musk's promise and filed a lawsuit against Media Matters and Eric Hananoki, the author of the November 16 and 17 articles. *X Corp. v. Media Matters for Am.*, No. 23 Civ. 1175 (N.D. Tex. Nov. 20, 2023), ECF 1 (the "Texas Action"). Although X Corp. is incorporated in Nevada and headquartered in California, and Media Matters is both incorporated and headquartered in Washington, DC, X Corp. filed its suit in the Northern District of Texas. In its operative complaint, X Corp. brings three tort claims under Texas law for tortious interference with contract, business disparagement, and interference with prospective economic advantage, all of which are premised on X Corp.'s allegation that Media Matters's articles published in November 2023 were factually inaccurate and were part of a "smear campaign" to "destroy X Corp.'s relationships with its advertising base." Ex. 6 ¶¶ 5-6, 65-88. X Corp. characterizes Media Matters's November 2023 articles as "the heart of" the Texas Action. *Id.* ¶ 23. In subsequent

[3] "Ex. __" refers to the exhibits attached to the Declaration of Jackson Erpenbach in Support of the Bonner Group's Motion to Quash X Corp.'s Nonparty Subpoena or for a Protective Order ("Erpenbach Decl.").

filings, X Corp. has demanded over $100 million in damages against Media Matters. *See, e.g.*, ECF 248-2 at 292, No. 23 Civ. 1175 (N.D. Tex. Oct. 7, 2025).

Media Matters continued to speak in the days following the Texas Action. In a November 26, 2023 interview, Media Matters's President and CEO, Angelo Carusone, stated that X's "tools that they claimed were in place to protect brands were not operating" properly. Ex. 7. In response, X Corp. added him as a defendant in the Texas Action. Ex. 6.

Musk did not stop with the Texas Action. In response to one X user's post about the Texas Action, Musk responded that the lawsuit was "[t]he first of many." Ex. 8. And in subsequent months, X Corp.'s international subsidiaries pursued legal actions against Media Matters abroad, including: a lawsuit in Ireland on December 7, 2023; a cease-and-desist demand and a lawsuit in Singapore on December 7, 2023, and July 23, 2024, respectively; and a cease-and-desist demand on December 19, 2023, in the United Kingdom. *See* Compl. ¶¶ 71-72, 79, 87, *Media Matters for Am. v. X Corp.*, No. 25 Civ. 2397 (N.D. Cal. Mar. 10, 2025), ECF 1. Media Matters filed an action in California to enjoin these international actions and enforce the exclusive forum-selection clause in X Corp.'s terms of service. *See id.* ¶¶ 123-44. The Northern District of California granted Media Matters's injunction, reasoning in part that "it seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights[.]" *Media Matters for Am. v. X Corp.*, No. 25 Civ. 2397, 2025 WL 1084715, at *1 (N.D. Cal. Apr. 10, 2025) (Chhabria, J.), *vacated and remanded on other grounds*, No. 25-2463, 2025 WL 3688854 (9th Cir. Dec. 19, 2025); *see also Media Matters for Am. v. X Corp.*, No. 25 Civ. 2397, 2025 WL 1853770, at *1 & n.1 (N.D. Cal. July 3, 2025) ("It appears that the real purpose of the foreign suits is to bully Media Matters.").

## II. Musk Encourages Harassment of Media Matters's Donors

Shortly after X Corp. filed the Texas Action, *The Washington Free Beacon* (an online newspaper "covering the enemies of freedom the way the mainstream media won't") published an article naming five individuals and foundations purported to be on Media Matters's "confidential donor list." Ex. 9. Following the article's publication, X users took to the platform to harass and threaten those who were named, often with antisemitic statements such as: "Brace yourself for this shocking surprise — they're all 'jewish' Democratic megadonors," Ex. 10; "Lot of Jewish sounding names, sure it's just a cohencidence," Ex. 11; and "Self-destructing Jews. More modern conveniences…" Ex. 12. Others called explicitly for violence or harsh punishment: "It's time for trials for treason and crimes against humanity. I want to see the death penalty served on all of them," Ex. 13, and "Tribunals in GITMO to save America!" Ex. 14. Musk amped up the rhetoric, resharing a post about *The Washington Free Beacon* article and promising to "add them as defendants in the lawsuit." Ex. 15. One user responded to Musk's post with a picture of Musk aiming a rifle at Media Matters's logo. Ex. 16. As the Texas Action has continued, Musk has asserted that Media Matters is "pure evil," Ex. 17, and "evil incarnate," Ex. 18.

## III. The Fifth Circuit Stays X Corp.'s Discovery into Media Matters's Donors

Following the purported leak of Media Matters's donors, and consistent with Musk's repeated promises to go after Media Matters's funding, X Corp. demanded in the Texas Action that Media Matters produce a broad swath of information about its donors, including (but not limited to) the following:

> **Request for Production 17**. Documents sufficient to show the identity of all Your donors or any others who provide financial support of any kind, their residence, the time and place of their donation or provision of financial support, and the amount of their donations or other financial support.
>
> **Request for Production 18**. Any document or communication reflecting Your attempts to solicit donations or financial support of any kind, including but not limited to any

> discussions with donors or any others who provided, considered providing, or were asked to provide financial support of any kind.
>
> **Request for Production 21**. All documents and communications regarding Your sources of funding for research, investigation, reporting, publication, or any other work related to X, the Platform, Elon Musk, or Linda Yaccarino.
>
> **Request for Production 35**. All materials regarding or communications with any donor or potential donor to Media Matters mentioning or regarding in any way this Matter, Elon Musk, Linda Yaccarino, X, Twitter, or the Platform, including misinformation, brand safety, or ad pairing on the Platform.

*X Corp. v. Media Matters for Am.*, 120 F.4th 190, 194 (5th Cir. 2024); *see also* Appendix at 13, 24, No. 23 Civ. 1175 (N.D. Tex. Aug. 30, 2024), ECF 85 (requests served February 5 and March 29, 2024, respectively).

Chief Judge Reed O'Connor granted X Corp.'s motion to compel, rejecting X Corp.'s argument that the First Amendment categorically did not apply to discovery between private parties, but concluding that Media Matters had waived its First Amendment privilege over private donor information. *X Corp. v. Media Matters for Am.*, No. 23 Civ. 1175, 2024 WL 4416887, at *7, *9 (N.D. Tex. Sept. 27, 2024).

Media Matters filed an interlocutory appeal and sought a stay of the discovery order pending appeal. The Fifth Circuit granted a stay, holding that even if Media Matters waived the First Amendment privilege, X Corp.'s discovery requests still exceeded the bounds of party discovery under Federal Rule of Civil Procedure 26(b)(1) because the information sought about Media Matters's donors was not "proportional to the needs of the case." *X Corp.*, 120 F.4th at 198. While the information was of little or no relevance or utility to X Corp., "Media Matters and its donors would bear a heavy burden if Media Matters had to release this information" because "[i]t could enable others to harass or intimidate Media Matters or its donors." *Id.* at 199. The court highlighted one of Musk's many statements about Media Matters's donors, stating that "X Corp.

would 'pursue not just [Media Matters] but anyone funding that organization. I want to be clear about that anyone funding that organization, will be, we will pursue them.'" *Id.*

The Fifth Circuit is also addressing venue issues in a parallel proceeding, and just recently, on August 21, 2026, vacated the Northern District of Texas's denial of Media Matters's motion to transfer the Texas Action to California, holding that the court's analysis was erroneous. *In re Media Matters for Am.*, No. 25-10630, 2026 WL 2453373, at *6 (5th Cir. Aug. 21, 2026). Media Matters's appeal of the discovery order on the merits is being held in abeyance until the venue issues are resolved and remains pending in the Fifth Circuit.[4]

## IV. X Corp. Instigates Retaliatory State and Federal Investigations of Media Matters Targeting Donor Identification

As the Fifth Circuit put the brakes on X Corp.'s efforts to identify Media Matters's donors through discovery in the Texas Action, the public attacks on Media Matters by Musk—the world's richest person and a prominent political donor—caused the Attorneys General of Texas and Missouri to issue civil investigative demands ("CIDs") to Media Matters that sought, among other things, the identity of all its donors, all communications with those donors, and internal communications and strategizing. *See Media Matters for Am. v. Bailey*, No. 24 Civ. 147, 2024 WL 3924573, at *2-3 (D.D.C. Aug. 23, 2024) (Mehta, J.); *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 9-11 (D.D.C. 2024) (Mehta, J.), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025). The court in each case concluded that the CIDs were likely retaliation for Media Matters's First Amendment–protected speech about Musk and X Corp. and enjoined the CIDs. *Bailey*, 2024 WL 3924573, at *10-19; *Paxton*, 732 F. Supp. 3d at 27-30. In a unanimous decision, the D.C. Circuit agreed,

---

[4] *In re Media Matters for Am.*, No. 25-10630 (5th Cir. Aug. 21, 2026), ECF 93-1 ("Media Matters' interlocutory appeal [of the discovery order] remains HELD IN ABEYANCE until any new mandamus petition is resolved [in Case No. 25-10630]"); *X Corp. v. Media Matters for Am.*, No. 24-10900 (5th Cir. Aug. 27, 2026), ECF 153.

concluding that Media Matters's reporting was "obviously . . . protected under the First Amendment" and that Attorneys General Bailey and Paxton began their investigations in direct response to Musk's statements to retaliate against Media Matters for its protected conduct. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 571-72, 584-85 (D.C. Cir. 2025).

Later, in May 2025, while Musk held a high-level position in the Executive Branch, *e.g.*, *In re Musk*, 169 F.4th 445, 447 (4th Cir. 2026), the Federal Trade Commission issued a CID to Media Matters containing a similar set of requests to what X Corp. and the state attorneys general had served, *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 116-17 (D.D.C. 2025) (Sooknanan, J.). Again, a court in this District held that the CID was unlawful retaliation, stemming from Musk's public statements on X, and enjoined the CID's enforcement. *Id.* at 134-38. And, again, the D.C. Circuit agreed, holding that the CID's "sweeping demand" for information about, and communications with, donors was likely issued in retaliation for Media Matters's protected reporting about X. *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *6-9 (D.C. Cir. Oct. 23, 2025) (per curiam).

## V. X Corp. Serves Subpoenas on Media Matters's Donors and Fundraisers, Including the Bonner Group

This motion arises from the latest tactic Musk and X Corp. are trying to obtain the same donor-related information. This time around, X Corp. has issued a slew of nonparty subpoenas directly to donors and fundraisers linked publicly to Media Matters. On July 27, 2026, X Corp. served the Subpoena on the Bonner Group. *See* Erpenbach Decl. ¶ 21; Ex. 19.

The Bonner Group is a professional fundraising firm whose clients include progressive nonprofits and political campaigns. Declaration of Allison Thompson in Support of the Bonner Group's Motion to Quash X Corp.'s Nonparty Subpoena or for a Protective Order ("Thompson Decl.") ¶¶ 3-4. The Bonner Group is headquartered in Washington, DC. *Id.* ¶ 3. One of the Bonner

Group's clients is Media Matters. *Id.* ¶ 10. As an outside fundraiser, the Bonner Group has no editorial control over Media Matters's journalism or the topics or campaigns that Media Matters's reports will cover. *Id.* ¶ 12. The Bonner Group did not draft, edit, or otherwise revise Media Matters's November 2023 articles about X. *Id.* ¶ 11.

The Bonner Group Subpoena includes 13 requests for documents and information that seek broad swaths of information about the Bonner Group's organizing activities and communications with donors, often unrelated to X Corp.'s claims in the Texas Action:

> **REQUEST FOR PRODUCTION NO. 1:** All documents and communications that concern any of the following: (a) boycotting the Platform; (b) outreach or communications targeted at X's advertisers (or potential advertisers) regarding the Platform; (c) building, coordinating, or participating in any public pressure campaign relating to content moderation on the Platform or aimed at reducing or discouraging advertising on the Platform; or (d) the goals, objectives, strategies, or plans of The Bonner Group or Media Matters concerning any of the matters described in subparagraphs (a) through (c) above.
>
> **REQUEST FOR PRODUCTION NO. 2:** Documents sufficient to show any events, trainings, videos, conferences, or webinars hosted or circulated by You, Defendants, Media Matters Action Network, or Unbendable Media LLC concerning (a) X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.
>
> **REQUEST FOR PRODUCTION NO. 3:** All documents concerning (a) X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.
>
> **REQUEST FOR PRODUCTION NO. 4:** All documents and communications concerning any request, solicitation, requirement, or condition (whether formal or informal) that obligates or encourages Defendants to organize, conduct, or participate in: (a) efforts to boycott the Platform or to encourage others, including its advertisers to do so, (b) public pressure campaigns relating to content moderation, ad adjacencies, brand safety, or advertising on the Platform, or (c) efforts aimed at reducing or discouraging advertising on the Platform. This includes any such requests or conditions contained in grant agreements, donation agreements, funding proposals, or similar instruments.
>
> **REQUEST FOR PRODUCTION NO. 5:** Documents sufficient to show the performance, reach, engagement, distribution, or fundraising impact of articles, media appearances, other editorial content, research, or studies published by

Defendants concerning [(a)] X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

**REQUEST FOR PRODUCTION NO. 6:** All documents and communications concerning inquiries received, solicitations made, and grants or donations tracked or reported by The Bonner Group in connection with (i) the Articles, (ii) the Matter, or (iii) any articles, appearances, other editorial content, research, or studies published by Defendants concerning (a) X, (b) Elon Musk, or (c) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

**REQUEST FOR PRODUCTION NO. 7:** All documents and communications concerning reports, updates, certifications, or accounting provided by or on behalf of Defendants to any funder, donor, or intermediary in connection with (i) the Articles, (ii) the Matter, or (iii) any articles, appearances, other editorial content, research, or studies published by Defendants concerning (a) X, (b) Elon Musk, or (c) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

**REQUEST FOR PRODUCTION NO. 8:** All contracts, statements of work, or other agreements governing Your engagement or affiliation with Defendants or Media Matters Action Network.

**REQUEST FOR PRODUCTION NO. 9:** Documents sufficient to show the formation, bylaws, charter, mission, and organizational structure of The Bonner Group, and affiliation with Defendants and Media Matters Action Network.

**REQUEST FOR PRODUCTION NO. 10:** Documents sufficient to identify and describe the roles of Your employees, contractors, board members, or volunteers who provided services or otherwise acted on behalf of Defendants, or Media Matters Action Network.

**REQUEST FOR PRODUCTION NO. 11:** Documents sufficient to identify all costs, facilities, vendors, or other resources shared between You and Defendants or Media Matters Action Network.

**REQUEST FOR PRODUCTION NO. 12:** Documents sufficient to show the total number of Media Matters's donors or grantors who at the time of donation or grant award were either: (a) individuals residing in the Northern District of Texas, or (b) entities, including without limitation corporations, partnerships, associations or other organizations or entities, with a principal place of business, registered office or mailing address in the Northern District of Texas. This request does not seek the name or other personally identifiable information of the donor.

**REQUEST FOR PRODUCTION NO. 13:** All Documents concerning Advocacy Campaigns and efforts to aid, participate in, or otherwise support Advocacy Campaigns.

Ex. 19 at 8-9.

The Bonner Group Subpoena does not define many of the key terms used in its requests, including "public pressure campaign," "misinformation," or "content moderation," and defines other terms in exceedingly broad terms, such as "Advocacy Campaigns" as "any organization, coalition, or other initiative" (including its "agents," "volunteers," or "persons . . . purporting to act on [its] behalf") "with an objective or goal to influence the conduct, policies, decisions, or profitability of X." Ex. 19 at 7. It does not include a date range limitation on any request, nor does it exclude from the requests information that X Corp. has already obtained from Media Matters or that X Corp. has been expressly denied in the Texas Action.

The Bonner Group Subpoena sets a response deadline of August 7, 2026. Ex. 19 at 1. On August 5, 2026, counsel for X Corp. agreed to extend the Bonner Group's deadline to respond to the Subpoena to September 4, and subsequently to September 11 and then September 18. Erpenbach Decl. ¶¶ 22, 24-25. Counsel for the Bonner Group offered to meet and confer with counsel for X Corp., proposing that X Corp. withdraw its Subpoena until the Fifth Circuit has ruled and then consider a tailored subpoena, proportional to the needs of the case, and consistent with the Bonner Group's First Amendment rights. *Id.* ¶ 23. Counsel for X Corp. initially agreed to meet and confer but later responded that they were unwilling to meet and confer about the proposal or the scope of the Subpoena before the Bonner Group's response date. *Id.* ¶¶ 24-25. The Bonner Group therefore files (before that response date) this motion to quash the Subpoena to protect its First Amendment rights and its right as a nonparty to be free from unduly burdensome subpoenas.

## LEGAL STANDARD

Under Rule 45, a nonparty may file a motion to quash a subpoena in "the district where compliance is required." Fed. R. Civ. P. 45(d)(3). The court is "[r]equired" to quash or modify the subpoena if it "requires disclosure of privileged or other protected matter" or if the subpoena

"subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv); *see also* Fed. R. Civ. P. 45(d)(1) (imposing a "duty" on the court and the subpoenaing party to ensure a subpoena does not "impos[e] undue burden or expense on a person subject to the subpoena").

Courts have "long recognized" a First Amendment privilege against disclosure of political affiliations and activities when such disclosure threatens to chill speech or otherwise impose a substantial burden on First Amendment rights. *See AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 175-76 (D.C. Cir. 2003).

To determine if a subpoena imposes an undue burden, courts consider several factors, including (1) "whether the discovery is unreasonably cumulative or duplicative"; (2) "whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive"; and (3) "whether the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. 16, 18 (D.D.C. 2013) (quoting *In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013)).

Rule 45 also incorporates the limits on civil discovery in Rule 26, *Diamond Servs. Mgmt. Co. v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 338 (D.D.C. 2021), which requires that all discovery must be "relevant to a[] party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1). Although relevance is a broad standard, it excludes "information with no conceivable bearing on the case." *Burlington Ins. Co. v. Okie Dokie, Inc.*, 368 F. Supp. 2d 83, 86 (D.D.C. 2005) (internal quotations omitted). And courts assess the proportionality requirement in light of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources,

the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

In applying the limits of discovery to a nonparty subpoena, Rule 45 requires that courts be sensitive to the subpoena recipient's nonparty status. *N.C. Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005); *see Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) (Kavanaugh, J.) ("The Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties."). Accordingly, a court may quash a subpoena under Rule 45 even if the subpoena seeks information with some relevance to the underlying action. *See In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d 54, 58-61 (D.D.C. 2023).

Based on similar considerations, a court may also issue a protective order, including to stay discovery, in lieu of quashing a nonparty subpoena. *See* Fed. R. Civ. P. 26(c)(1).

## ARGUMENT

### I. The Subpoena Should Be Quashed Because It Requires the Disclosure of Privileged Material that Is Irrelevant and Must Be Sought Elsewhere

The Court should quash the Subpoena because it demands disclosure of information and communications about the Bonner Group's First Amendment–protected association with its donors, its clients, and like-minded organizations and individuals. X Corp. cannot make a showing of need sufficient to overcome the Bonner Group's First Amendment privilege.

Courts in this District consider a motion to quash a subpoena based on the First Amendment privilege using a two-step burden-shifting framework that balances the subpoena recipient's First Amendment rights against the demonstrated interest of the party seeking disclosure. *See In re Subpoenas Served on Am. Acad. of Pediatrics*, No. 23 Misc. 4, 2023 WL 2351729, at *1 (D.D.C. Mar. 3, 2023). First, the party asserting the First Amendment privilege must make a *prima facie* showing that enforcement of the subpoena infringes upon a First Amendment interest. To do so,

the nonparty "need not prove to a certainty that its First Amendment Rights will be chilled by disclosure[,] . . . only . . . some probability that disclosure will lead to reprisal or harassment." *Black Panther Party v. Smith*, 661 F.2d 1243, 1267-68 (D.C. Cir. 1981), *cert. granted and vacated on other grounds*, 458 U.S. 1118 (1982); *see also N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989) ("Mindful of the crucial place speech and associational rights occupy under our constitution, we hasten to add that in making out a *prima facie* case of harm the burden is light.").

If that *prima facie* case is made, the burden shifts to the subpoenaing party to demonstrate both that (a) "the requested information goes to the heart of the lawsuit" and is "crucial to the party's case," *In re Kincaid*, No. 21 Misc. 67, 2023 WL 5933341, at *5, *7 (D.D.C. Aug. 9, 2023) (internal quotations omitted), *R&R adopted*, 2023 WL 6459801 (D.D.C. Oct. 4, 2023); and, further, (b) the subpoenaing party "has exhausted every reasonable alternative source of information," *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3-4 (D.D.C. 2002) (quotation omitted).

Because the Bonner Group Subpoena cannot withstand application of this doctrinal framework, the Court should quash it in full.

### A. The Bonner Group Has Well-Recognized First Amendment Interests at Stake

The Bonner Group has several distinct and well-established First Amendment interests at stake.

*First*, as the Supreme Court recently reiterated, the First Amendment protects the right to associate with others, which includes the right to "privacy in one's associations." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1123 (2026) (quoting *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)). To protect the right to associate, the D.C. Circuit has long recognized a First Amendment privilege against the disclosure of political affiliations, internal

communications, strategies, and organizing when such disclosure threatens retaliation or to chill protected First Amendment activity. *See, e.g.*, *AFL-CIO*, 333 F.3d at 177-78; *Black Panther Party*, 661 F.2d at 1265-66; *Int'l Union, UAW v. Nat'l Right to Work Found.*, 590 F.2d 1139, 1147-48 (D.C. Cir. 1978). As the Ninth Circuit has explained, "[i]mplicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1162 (9th Cir. 2010).

The Bonner Group Subpoena tramples these well-established principles. From top to bottom, it seeks to compel the Bonner Group to disclose its private associations with like-minded clients, donors, and partners; its internal communications and strategy efforts; and its methods for effectively organizing to achieve the Bonner Group's (and its donors' and clients') political and social objectives. That should come as no surprise given Musk's stated goal of using discovery in the Texas Action to attack not only Media Matters but its "donors" and "network." *Supra* at 3-5.

This violation of the First Amendment privilege infects the entire Subpoena, but is clearest in Requests 1, 2, 3, 5, 8, 9, 10, 11, and 13. Requests 1, 2, 3, and 13 all seek nonpublic information about efforts to strategize, organize, and carry out core associational activities between like-minded individuals and organizations regarding topics of immense political, legal, and social importance. Request 3, for example, seeks "[a]ll documents concerning" X, Musk, the Media Matters Articles, the Texas Action, or misinformation and content moderation on X. Ex. 19 at 8. Of course, Elon Musk is the country's wealthiest and one of the country's most influential individuals, a prominent partisan operative, and (until recently) a high-level member of the Executive Branch. Requests 2, 3, and 13 likewise seek effectively all documents and communications concerning broad topics of "misinformation" and "content moderation" on social

media, topics of heated and ongoing public debate. *Id.*; *see, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 717 (2024); *TikTok Inc. v. Garland*, 604 U.S. 56, 68-69 (2025) (per curiam).

These and similar requests for documents "concerning" Musk, X, and topics of misinformation and content moderation without any time limitation could sweep up an enormous number of documents between the Bonner Group, its clients (many of whom are political candidates or campaigns or operatives opposed to Musk), and donors, regarding overtly political topics. Thompson Decl. ¶¶ 14-19. The Bonner Group's clients expect those communications to remain private, and the Bonner Group is contractually obligated to maintain that confidence. *Id.* ¶ 9. The Subpoena would require disclosing those activities and strategies directly to those groups' political adversaries, which would cut at the heart of the First Amendment privilege. *See AFL-CIO*, 333 F.3d at 177; *Perry*, 591 F.3d at 1162.[5]

Requests 1 and 13 seek all information about organizing "any public pressure campaign," "boycotting," and "Advocacy Campaigns" to change consumers' and companies' decisions. Ex. 19 at 8-9. But the Supreme Court has for decades recognized that the "the boycott is a form of speech or conduct" protected by the First Amendment, including when it is intended to inflict economic injury on a business. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982). And the right to privacy is no less protected for "political association spanning more than one organization or entity" to "engage[] in the formulation of strategy and messages." *Perry v. Schwarzenegger*, 602 F.3d 976, 981 (9th Cir. 2010). Indeed, organized boycott activity was one

[5] For similar reasons, Request 5, which demands information on methods and metrics to raise funds and engage partners, seeks protected material. *See RNC v. Pelosi*, 602 F. Supp. 3d 1, 33 (D.D.C. 2022) (identifying a First Amendment interest in how the RNC uses technology platforms to "engage its donors, volunteers, and email recipients"), *vacated as moot*, No. 22-5123, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022) (per curiam).

of the targets for Alabama's demand that the NAACP disclose its private membership information, a demand the Supreme Court famously rejected. *NAACP*, 357 U.S. at 452, 466.

Requests 8, 9, 10, and 11 seek information about how the Bonner Group is structured internally, who its employees and volunteers are and what they do, and how the Bonner Group structures its relationship with other organizations. Ex. 19 at 9. These requests squarely infringe the Bonner Group's First Amendment interest in protecting "how it organizes itself and conducts its affairs." *RNC*, 602 F. Supp. 3d at 33; *AFL-CIO*, 333 F.3d at 177. Moreover, exposing the names and duties of all "employees, contractors, board members, [and] volunteers," Ex. 19 at 9, risks not only disclosing the Bonner Group's internal operations to its opponents, but further risks subjecting those individuals to public retaliation and harassment, which could further undermine the Bonner Group's efforts to "recruit future personnel" and retain participants essential to its associational activities. *AFL-CIO*, 333 F.3d at 176; *Perry*, 591 F.3d at 1162 ("[T]he disclosure of such information can have a deterrent effect on participation in campaigns. There is no question that participation in campaigns is a protected activity."); *see* Thompson Decl. ¶¶ 22, 28.

*Second*, the Bonner Group has a First Amendment interest in protecting the privacy of donors to political and charitable organizations and causes. The Supreme Court has repeatedly recognized a First Amendment interest in preserving private donor information, explaining that "demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights.'" *First Choice*, 146 S. Ct. at 1123 (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976) (per curiam)); *Americans for Prosperity Found. v. Bonta* ("*AFP*"), 594 U.S. 595, 618 (2021) (holding that demands to disclose private donor information "impose[] a widespread burden on donors' associational rights"); *Buckley*, 424 U.S. at 66 ("[T]he invasion of

privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations . . . .").

The Bonner Group Subpoena is shot through with demands for private information about donors, and prospective donors, to Media Matters and to a wide swath of the Bonner Group's other nonprofit and political clients. Request 4, for instance, seeks all information "concerning any request [or] solicitation" relevant to boycott efforts or public pressure campaigns, and Request 6 even more broadly seeks all "solicitations," "grants," and "donations" "in connection with" or "concerning" X, Musk, or misinformation or content moderation on social media. Ex. 19 at 8. Request 7 demands information communicated to donors about those broad topics of obvious political and social significance. *Id.* Even Request 3, which does not expressly mention donors, is so broad as to sweep in any and all communications with the Bonner Group's donors for any of its clients, that mentions Musk or X, even if that reference has no connection to the Texas Action. *Id.* These requests plainly implicate the Bonner Group's First Amendment privilege (and the privileges of its clients and donors) to maintain the privacy of donor information, Thompson Decl. ¶¶ 14-16, 23-26—all the more so where the information is sought by a party that has promised publicly to use that information to attack those donors, *see First Choice*, 146 S. Ct. at 1124-25.

To be sure, Request 12 disclaims that "*[t]his request* does not seek the name or personally identifiable information of the donor." Ex. 19 at 9 (emphasis added). But that disclaimer is absent from every other request in the Bonner Group Subpoena, the majority of which have the obvious purpose—and in all events the effect—of seeking communications to and from identifiable donors (and potential donors) to Media Matters. Even as to Request 12, X Corp. seeks information about methods and successes of fundraising in which the Bonner Group has a First Amendment interest. *See RNC*, 602 F. Supp. 3d at 33.

*Third*, and relatedly, the Bonner Group, as a dedicated fundraising firm for progressive nonprofits and Democratic campaigns, has a First Amendment interest in effectively soliciting charitable donations. *See AFP*, 594 U.S. at 617-18; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789-90, 794 (1988) (explaining that "the solicitation of charitable contributions is protected speech," including when solicitation is conducted by "professional fundraisers"); *id.* at 803 (Scalia, J., concurring in part and concurring in the judgment) ("We have held the solicitation of money by charities to be fully protected as the dissemination of ideas.").

The Bonner Group Subpoena demands—in at least Requests 3, 4, 5, 6, 7, and 13—that the Bonner Group disclose its communications with donors as well as its strategies and efforts to solicit funds on behalf of clients. Such a forced disclosure would obstruct the Bonner Group's efforts to solicit funds from donors, stifle the candid exchange of information between the Bonner Group and its donors, and chill donations from donors who do not wish their support to be made public, Thompson Decl. ¶¶ 7-8, 14-16, 20-24, each and all of which constitutes an injury to the Bonner Group's First Amendment interests, *see Riley*, 487 U.S. at 799-800 (holding that forced disclosures that "hamper the legitimate efforts of professional fundraisers to raise money for the charities they represent" infringe the First Amendment).

* * *

With respect to all of these infringements, the risk of retaliation, harassment, and resulting chill to First Amendment activity cannot be overstated. In this extraordinary case, retaliation is not just the byproduct, but the express purpose of X Corp.'s discovery tactics against the Bonner Group and other nonparties. That much is clear from Musk's own statements that he and X Corp. will go after Media Matters's "donors" and "network" of funding, will "pursue" those donors, and will "add [donors] as defendants in the lawsuit." *Supra* at 3, 5-6. Other forms of retaliation have already

been suffered: After only a few donors' information was purportedly leaked publicly, those individuals and organizations faced a slew of online harassment that indulged in hateful antisemitic remarks and threatened violence. *Supra* at 5. And rather than turn down the temperature, Musk has only further stoked the fires by periodically telling his (hundreds of millions of) online followers that Media Matters and its partners are "pure evil," Ex. 17, and "evil incarnate," Ex. 18. Moreover, as noted, courts in this Circuit—collectively reflecting the views of seven federal judges—have further held that Musk's public attacks on Media Matters led to a series of retaliatory investigations against Media Matters to punish it for protected First Amendment speech. *Supra* at 7-8.

It is clear, especially in this context, that the Bonner Group Subpoena threatens to chill protected First Amendment conduct. Musk's campaign against Media Matters has already chilled some donors from donating to Media Matters and further chilled them from communicating with the Bonner Group. Thompson Decl. ¶¶ 28-29. In providing its clients and donors with fundraising, organizing, and operational support, the Bonner Group is expected to (and is often contractually obligated to) keep their information strictly confidential. *Id.* ¶ 9. If the Bonner Group is compelled to disclose additional information about its donors, as well as those donors' confidential communications with the Bonner Group, the chilling effect will only cascade, and affect not only the Bonner Group's work on behalf of Media Matters but also a large number of other nonprofit and political clients, for fear that their association too will be disclosed publicly to Musk, a prominent individual and operative that many of them have opposed. *Id.* ¶ 29.

This risk of retaliation and chill would not be ameliorated even if X Corp. promised to keep the Bonner Group's responses confidential (a promise that the Subpoena does not make). As the Fifth Circuit recognized, Chief Judge O'Connor has refused to issue a protective order in the Texas Action, heightening the risk that X Corp. will share the Bonner Group's confidential information

freely to carry out exactly the retaliatory conduct that it has promised publicly to do. *See X Corp.*, 120 F.4th at 199. Even if such an enforceable order were in place, it still would be insufficient. The Supreme Court has held repeatedly that requests for disclosure of private information chill First Amendment conduct even if public dissemination of the information is prohibited. *See, e.g.*, *First Choice*, 146 S. Ct. at 1130-31; *AFP*, 594 U.S. at 615-17. The same result is true here, where disclosure would be made directly to Musk's X Corp., a political opponent of the associational activity at issue.

Last, X Corp. may argue, as it has in the Texas Action, that the First Amendment has no application to a discovery demand by a private party. That position is grievously mistaken. X Corp. seeks to invoke the coercive power of the state to enforce its demands for privileged information, and its request thus necessarily implicates the First Amendment. Accordingly, courts in this Circuit have consistently held that the First Amendment privilege applies equally to discovery demands by private parties as it does to compelled disclosure to the government. *See, e.g.*, *In re Kincaid*, No. 22 Misc. 67, 2023 WL 6459801, at *4-5 (D.D.C. Oct. 4, 2023) (applying First Amendment privilege to nonparty subpoena issued by private nonprofit to law firm); Memorandum Opinion & Order at 23-30 ("Mehlhorn Opinion"), *Mehlhorn v. No Labels*, No. 24 Misc. 101 (D.D.C. Dec. 23, 2024), ECF 20-1 (quashing in large part subpoena issued by private political party to opposing political organizer based on First Amendment privilege). Chief Judge O'Connor also rejected the argument in the Texas Action. *See X Corp.*, 2024 WL 4416887, at *9. And so has every circuit to have considered the issue. *See, e.g.*, *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 481 (10th Cir. 2011) ("[T]he First Amendment privilege applies to discovery orders issued in litigation involving only private parties."); *Perry*, 591 F.3d at 1160-65 (ordering district court to issue a protective order against private plaintiff's discovery requests on basis of First Amendment);

*Whole Woman's Health v. Smith*, 896 F.3d 362, 369-70, 372-74 (5th Cir. 2018) (applying First Amendment protection to private plaintiff's discovery request to private, religious nonprofit).

For these reasons, the Bonner Group has met its burden to make a *prima facie* showing that the Bonner Group Subpoena infringes upon its privileged First Amendment interests.

**B. The Subpoena Seeks Information Irrelevant to the Texas Action**

Because the Bonner Group has made a *prima facie* showing of First Amendment harm, the burden shifts to X Corp., which cannot make the necessary showing to enforce its slew of broad requests. To start, the Bonner Group Subpoena does not seek information relevant to the claims or defenses in the Texas Action, let alone information at the "heart of" or "crucial to" the case. *In re Kincaid*, 2023 WL 5933341, at *5, *7.

The straightforward reason for X Corp. seeking this information from the Bonner Group is that Musk and X Corp. want to harass, and then maybe try to sue, the Bonner Group and its donors. *See supra* at 4-6. But it is black-letter law in this Circuit that such a "naked attempt to gather information for use in evaluating, and perhaps litigating, a claim against" a subpoena recipient is improper under Rules 26 and 45. *Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. at 18; *see also, e.g.*, *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 995-96 (D.C. Cir. 2014) ("[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied." (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978))); Mehlhorn Opinion at 22 (quashing subpoena where subpoenaed party "raise[d] valid concerns that the information [the subpoena] seeks is not for use in the [underlying litigation] as it currently exists but for some future additional litigation").

Perhaps trying to back away from their client's admitted purpose, counsel for X Corp. offered an alternative explanation for discovery into private donor information at the Fifth Circuit, where they speculated that "[i]f there was a great deal of donors or great deal of dollars from

donors who happen to have an axe to grind with X or . . . Elon Musk or Twitter or anything else relevant in the case, that would go a long way to being able to show to a jury a reason for why Media Matters lied."[6] This theory of relevance is admittedly a "fishing expedition" based on speculation about who Media Matters's donors are, what their views about Musk and X Corp. may be, and what they might have communicated about those views to the Bonner Group or Media Matters—all speculation that cannot justify discovery from a nonparty. *Diamond Servs. Mgmt. Co.*, 339 F.R.D. at 340.

Even if X Corp.'s unsupported hypothesis were later proven correct, the information would still be irrelevant because the only motives relevant to any of X Corp.'s claims are the motives of the three defendants in the Texas Action. It is irrelevant to Media Matters's motives if nonparties donated to Media Matters out of a secret dislike for Musk—only Media Matters (not nonparties) has information regarding Media Matters's internal beliefs. *See N.C. Right to Life, Inc.*, 231 F.R.D. at 51 (quashing nonparty subpoena, holding that the only relevant bias was that of the parties, not of "an unrelated non-party"); *US Dominion Inc. v. My Pillow Inc.*, No. 21 Civ. 445, 2024 WL 2880425, at *5-6 (D.D.C. June 7, 2024) (denying enforcement of subpoena that sought information belonging to nonparties where party had not relied on that information at the time to make allegedly defamatory statements).

Accordingly, even requests targeted precisely at these theories of relevance would not overcome the Bonner Group's First Amendment rights and justify the Bonner Group Subpoena. But the Bonner Group Subpoena is not so targeted. Instead, X Corp.'s requests sweep well beyond information consistent with their relevance arguments. Requests 2 and 3, for instance, demand any

---

[6] Oral Argument at 18:40, *X Corp. v. Media Matters,* No. 24-10900 (5th Cir. Feb. 18, 2025), https://www.ca5.uscourts.gov/oral-argument-recordings?docket=24-10900.

and all mentions of Musk or X without any date limitation or any connection to Media Matters or the Texas Action. Those requests would sweep in a large volume of communications about the daily news and the Bonner Group's other organizing work that is indisputably irrelevant to X Corp.'s claims. Thompson Decl. ¶¶ 16-21. Musk, after all, is an "exceptionally famous public figure," *Jigsaw Prods., Inc. v. SEC*, 824 F. Supp. 3d 56, 58 (D.D.C. 2026), who, until recently, held a "high-level" and highly contested position in the Executive Branch, *In re Musk*, 169 F.4th at 447; *see also* Thompson Decl. ¶ 21. And the X platform—X Corp. should know—is one of the most-visited sites to distribute and discuss news and politics. *See* Thompson Decl. ¶ 19.

Requests 1, 5, and 13 seek information with only a tangential connection to Musk and the X platform without any requirement of relevance to any of the named Defendants. And Requests 8, 9, 10, and 11 all relate to the structuring of the Bonner Group, but the internal organization of a nonparty is irrelevant to Media Matters's alleged motives in publishing articles in November 2023 about X Corp.

In sum, the Bonner Group Subpoena seeks information that is irrelevant to the Texas Action, which is about the alleged conduct of the named Defendants, not nonparties. And even if it could show some tangential relevance or marginal utility to some portion of some requests, X Corp. does not come close to demonstrating that the information sought lies at the "heart of" or is "crucial to" its claims, and so cannot overcome the Bonner Group's well-established First Amendment privileges.

**C. X Corp. Can and Must Seek Information Elsewhere**

Even if X Corp. could demonstrate that the information it demands is truly crucial to the Texas Action, X Corp. cannot make the further required showing that it has sought the information through alternative sources and has been unable to obtain it. *See Int'l Action Ctr.*, 207 F.R.D. at 3-4; *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 454-55 (D.D.C. 2002).

If X Corp. wants to know what donations Media Matters received, who provided those donations to Media Matters, and what representations Media Matters made to those donors (or vice versa), then X Corp. should obtain that information directly from Media Matters rather than burden nonparties. X Corp. cannot point to any reason why the documents it seeks are not obtainable from Media Matters directly, save for the uncomfortable fact that the Fifth Circuit has stayed X Corp.'s requests for that party discovery. *Supra* at 6. To state the obvious, a temporary stay does not amount to exhaustion. And a Fifth Circuit ruling blocking that party discovery would only weigh further against the improper nonparty effort at issue. Put another way, either X Corp. will ultimately get some limited donor information from Media Matters after the Fifth Circuit rules, or it cannot properly obtain that information at all. In no event should it be permitted to end-run party discovery by compelling the Bonner Group to hand that same discovery over directly.

Further, to the extent X Corp. seeks public statements by Media Matters's donors about Musk, they may obtain such statements from public sources without burdening nonparties. Even if the Bonner Group were to have documents concerning Media Matters's donations or strategies that are not in the possession, custody, or control of Media Matters, then those documents would be irrelevant because they would not bear on Media Matters's motivations. *See N.C. Right to Life, Inc.*, 231 F.R.D. at 51; Mehlhorn Opinion at 32 ("[T]he best sources for relevant information Petitioners could possess are those actually involved in the allegedly [unlawful conduct].").

Finally, X Corp. must also demonstrate that the Bonner Group Subpoena's requests are not impermissibly duplicative of documents and information that X Corp. has obtained already in the Texas Action. *See Phillips & Cohen, LLP*, 300 F.R.D. at 18. Based solely on public documents, Media Matters has produced an astonishing amount of discovery to date. As of March 2026, Media Matters had produced over 400,000 pages of documents in response to more than 200 requests for

production by X Corp. Defs.' Opp. to X Corp.'s Mot. to Compel at 1, No. 23 Civ. 1175 (N.D. Tex. Mar. 11, 2026), ECF 275-1. Now, Media Matters's Bates stamps go well past 540,000. ECF 311 at 73. Those numbers do not even count the thousands of videos and other electronic data that Media Matters has produced. LeGrand Decl. ¶ 25, No. 23 Civ. 1175 (N.D. Tex. May 29, 2024), ECF 62-1. The Bonner Group Subpoena reflects zero effort to target anything that X Corp. might genuinely need from the Bonner Group to prosecute the Texas Action in light of the substantial discovery it has received already, and its demand that the Bonner Group produce a large volume of potentially duplicative materials is independent grounds to quash. *See In re Subpoena to Goldberg*, 693 F. Supp. 2d 81, 87 (D.D.C. 2010) (quashing nonparty deposition subpoena that sought duplicative testimony).

Because the Bonner Group Subpoena seeks a wide swath of materials protected by the First Amendment privilege, and X Corp. cannot show those materials are both crucial to the Texas Action and unavailable from any alternative source, this Court should quash the Subpoena.

**II. The Subpoena Imposes an Undue Burden on The Bonner Group**

Independent of the fact that the Bonner Group Subpoena would require disclosure of privileged material, this Court should quash the Subpoena because it would subject the Bonner Group to undue burden. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv).

For the reasons explained above, *supra* at 22-25, X Corp. cannot show that the expansive categories of documents demanded from the Bonner Group are relevant to the Texas Action. On the other side of the scale, the Bonner Group Subpoena imposes substantial burdens on the Bonner Group if it were to comply. Those burdens start (but do not end) with the First Amendment privilege identified above, *supra* at 14-20, since that burden, "however slight, is necessarily undue," *Gouse v. District of Columbia*, 359 F. Supp. 3d 51, 56 (D.D.C. 2019) (quoting *AF Holdings, LLC*, 752 F.3d at 995). Additionally, the same risks of retaliation, harassment, and chill

described above provide a sufficient basis for the Court to conclude that the Bonner Group Subpoena would impose a substantial burden that far exceeds any purported benefits of the information sought. *See X Corp.*, 120 F.4th at 198-99; *N.C. Right to Life, Inc.*, 231 F.R.D. at 52.

But the burdens on the Bonner Group do not stop there. The Subpoena's 13 requests are facially broad in scope, are often vague in meaning, and impose no temporal limitation or date range at all. According to X Corp.'s Subpoena, every passing mention of Elon Musk—one of the most influential and omnipresent individuals in the country over the last decade—is responsive. The absence of a date range alone is a basis to hold the Subpoena is "patently overbroad." *Benham v. Rice*, 238 F.R.D. 15, 19-27 (D.D.C. 2006); *United States v. Int'l Bus. Machs. Corp.*, 83 F.R.D. 97, 107 (S.D.N.Y. 1979) ("A demand for documents should cover a reasonable time period to insure that the materials desired are sufficiently identified and to confine the search to relevant documents."). The combination of broad terms with no meaningful limitations means that a huge swath of the Bonner Group's internal and external communications and documents—likely well into the thousands or tens of thousands—would be flagged as potentially *responsive* (albeit, not in any sense *relevant*) and require review by one of the Bonner Group's employees or by outside counsel. Thompson Decl. ¶¶ 30, 32; *see Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 174 n.9 (D.D.C. 1998) (concluding that even a search for relevant information imposed an undue burden where the "requested search does not contain time limitations").

Conservatively, identifying potentially relevant documents would likely require hundreds of hours of time both from the Bonner Group's staff and that of its attorneys and their staff to collect the documents, review them, tag them, quality-check them, and process them for production. Thompson Decl. ¶ 32. That burden would be substantial for any subpoenaed party, but it is particularly so for the Bonner Group, a small organization with no in-house counsel whose

full-time employees have limited availability in the best of times, and—given the firm's roster of political campaigns—even less availability only two months away from a crucial midterm election. *Id.* ¶ 32. Indeed, Musk's comments about his aims make one wonder whether that sort of diversion is part of the point. In all events, time spent complying with the Subpoena will unavoidably trade off with the Bonner Group's core fundraising activity, and the substantial cost to retain counsel to perform this review will necessarily burden the firm's modest financial resources. *Id.* ¶¶ 31-32.

Under similar circumstances, courts in this District have not hesitated to conclude that a nonparty subpoena imposed an undue burden. *See, e.g.*, Mehlhorn Opinion at 30-32 (finding undue burden because review of potentially responsive documents "would require extensive expenditures on document reviewers, attorneys, and e-discovery vendors, even if few documents ended up being responsive") (internal quotations omitted); *In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d at 60-61 (subpoena imposes undue burden when "a non-party would be expected to review thousands of documents"); *N.C. Right to Life, Inc.*, 231 F.R.D. at 52 (subpoena imposed undue burden when it would "require an organization to sacrifice such a large proportion of its staff for several weeks"). The burden here would be greater still because the Bonner Group would need to take extra steps to comply with its contractual confidentiality obligations, Thompson Decl. ¶ 9, as well as to protect privileged information, clients' and donors' sensitive financial details, and other personally identifiable information that may not be produced, *see In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d at 60-61.

These significant costs—along with the serious invasion of the First Amendment privilege—when balanced against the total absence of legitimate discovery interests by X Corp., all point to the same conclusion: the Court should quash the Bonner Group Subpoena. Musk's and X Corp.'s public statements, and their years of vindictive litigation tactics, make plain that X Corp.

is using nonparty discovery to further its efforts to retaliate against, harass, and punish any individual or group who publicly criticizes them or who exercises their right to support others who do. This abuse of the discovery process should be put to a swift and decisive end.

**III. In the Alternative, this Court Should Stay Enforcement of the Subpoena Pending the Fifth Circuit's Decision on X Corp.'s Similar Requests for Party Discovery**

In the alternative, and at a minimum, the Court should issue a protective order that stays enforcement of the Subpoena pending a final decision on Media Matters's interlocutory appeal pending in the Fifth Circuit regarding X Corp.'s substantially similar requests for donor information and communications from Media Matters. *See supra* at 5-7; *X Corp. v. Media Matters for Am.*, No. 24-10900 (5th Cir.). As the Fifth Circuit's stay decision made clear, the discovery requests at issue there overlap significantly with the Bonner Group Subpoena, including because they seek information on all Media Matters donors, communications with donors, solicitations to donors (and potential donors), and sources of funding for Media Matters's research. *Compare X Corp.*, 120 F.4th at 194, *with* Ex. 19 at 8-9 (requesting the same information from the Bonner Group). There is thus every reason to expect that the Fifth Circuit's holding will bear directly on donor-related discovery that X Corp. is permitted to obtain. At a minimum, the decision could provide important guidance and limiting principles, and bear on the question of alternative sources. *Supra* at 24-26.

Indeed, were the Bonner Group required to produce documents in response to the Bonner Group Subpoena before the Fifth Circuit's decision is issued, the Bonner Group could, as a nonparty, be required to produce documents that Media Matters, a named party, need not produce, if the Fifth Circuit limits X Corp.'s requests consistent with its earlier stay decision. That result would flip the structure of nonparty discovery, with its special sensitivity to burden and cost and

nonparty status, on its head. *Contra Watts*, 482 F.3d at 509; *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980).

Accordingly, under Rule 26(c)(1), and the Court's inherent power to manage its docket, the Court should issue a protective order that prevents enforcement of the Subpoena at least until the Fifth Circuit has issued a final decision. *See, e.g.*, *In re Subpoena to Wang*, 214 F. Supp. 3d 91, 95-96 (D.D.C. 2016) (staying nonparty deposition pending resolution of discovery dispute over privilege in the Northern District of California that could determine propriety of some questions to be asked to minimize the burden on a nonparty); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (recognizing courts' inherent power to stay cases to manage their docket). To be sure, if the Fifth Circuit permits certain discovery of Media Matters, that decision would not resolve this motion, since the Bonner Group is a nonparty and resident of DC entitled to the protections of this Circuit's First Amendment privilege. That is why the Bonner Group has sought an order quashing the Subpoena in full. But as noted, a stay would at least permit the Fifth Circuit's guidance, and clarity around party discovery, to be accounted for. And a stay of enforcement would not prejudice X Corp., since it has stated it will wait for the Fifth Circuit's decision before proceeding to trial, *see* Joint Motion to Amend Scheduling Order, No. 23 Civ. 1175 (N.D. Tex. Sept. 8, 2026), ECF 363, and it would further conserve judicial, party, and nonparty resources, *see Stone v. Trump*, 356 F. Supp. 3d 505, 518 (D. Md. 2018) (staying enforcement of discovery order pending decision by the Ninth Circuit in case involving similar discovery issues).

## CONCLUSION

For the foregoing reasons, the Court should quash the Bonner Group Subpoena or, in the alternative, issue a protective order.

**RULE 7(m) STATEMENT**

As set forth herein, counsel for the Bonner Group has engaged in discussions with counsel for X Corp. in an attempt to resolve this matter without the necessity of this motion but the parties have been unable to reach an agreement.

Dated: September 14, 2026

Respectfully submitted,

Amy Jeffress, Bar No. 449258
Jackson Erpenbach, Bar No. 1735493
Rachel Freeh*
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com
jerpenbach@heckerfink.com
rfreeh@heckerfink.com

John C. Quinn*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com

**pro hac vice applications forthcoming*

*Attorneys for Nonparty the Bonner Group*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE BONNER GROUP,<br>Plaintiff,<br>v.<br>X CORP.,<br>Defendant. | Case No. ______<br><br>Underlying Litigation:<br>*X Corp. v. Media Matters for America*,<br>No. 23 Civ. 1175 (N.D. Tex.) |

**CERTIFICATE OF SERVICE**

I, Jackson Erpenbach, here certify, under penalty of perjury, that a true and correct copy of the Bonner Group's Motion to Quash X Corp.'s Non-Party Subpoena or Motion for a Protective Order, the accompanying Declaration of Jackson Erpenbach and Exhibits, the Declaration of Allison Thompson, the Notice of Motion, and the Proposed Order were served or delivered via certified mail to all counsel listed below on September 14, 2026.

Christopher D. Hilton
Elizabeth Brown Fore
**Stone Hilton PLLC**
600 Congress Ave.
Suite 2350
Austin, TX 78701
Phone: 737.465 3897
chris@stonehilton.com
elizabeth@stanehilton.com

*Counsel for X Corp.*

By: ______________________

Jackson Erpenbach
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
jerpenbach@heckerfink.com
Telephone: 212.763.0883
Facsimile: 212.564.0883

*Attorney for Nonparty the Bonner Group*

DATED: September 14, 2026