Docusign Envelope ID: D1F92D87-8936-81E3-82F1-06EE663EF855

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE BONNER GROUP,<br><br>Plaintiff,<br><br>v.<br><br>X CORP.,<br><br>Defendant. | Case No. _____ |

**DECLARATION OF ALLISON THOMPSON**
**IN SUPPORT OF THE BONNER GROUP'S MOTION**
**TO QUASH X CORP.'S NONPARTY SUBPOENA OR FOR A PROTECTIVE ORDER**

I, Allison Thompson, pursuant to 28 U.S.C. §1746, declare as follows:

1. I submit this declaration in support of the Bonner Group's motion to quash, or in the alternative, for a protective order in connection with X Corp.'s nonparty subpoena. I have personal knowledge of the facts set forth in this declaration except as stated otherwise. If called as a witness, I could and would testify competently to these facts under oath.

2. I am Vice President of Operations & Strategy at the Bonner Group, Inc., in Washington, DC.

3. The Bonner Group is a professional fundraising firm incorporated in Virginia and with its primary place of business in Washington, DC.

4. Although the Bonner Group has a large and diverse set of clients, the firm's primary client base includes progressive nonprofit organizations and political campaigns.

5. The Bonner Group's clients advocate for a range of causes. Many of these causes are considered to be controversial and are the subject of current political debate and public

discourse. Clients engage in a variety of activities to express and promote their views to elected officials and the public, including through journalism, political campaigns, ballot initiatives, lobbying, protests, and legal advocacy.

6. The Bonner Group's fundraising work requires regular communication with our clients, with current and potential donors, and with other organizations and individuals that align with the values and political and social objectives of the Bonner Group's clients and donors.

7. Clients trust the Bonner Group to know about the client's donors and the client's work, as well as to provide advice on the client's messaging to donors.

8. It is the Bonner Group's understanding that donors generally expect that the fact of their donations and any communications to or from them will remain confidential. In my professional experience, if donors expected that their donations and communications would be disclosed, far fewer of them would make donations, particularly to the Bonner Group's clients that face public controversy or take positions on issues of political debate. Donors would also be more reluctant to communicate directly with employees at the Bonner Group to learn about the work of the Bonner Group's clients. This breakdown in communication would hinder the Bonner Group's ability to effectively fundraise for its clients. In addition, in my professional experience, fundraising is most effective when both the donor and the fundraiser can engage in honest conversation with the expectation that those conversations will remain private.

9. Clients also demand that their communications with the Bonner Group remain confidential, and the Bonner Group works hard to protect that confidentiality. Often, confidentiality is required by the Bonner Group's contracts with its clients. This communication with clients is possible only because each participant understands the communication will remain confidential.

10. One of the Bonner Group's clients is Media Matters.

11. Based on a reasonable inquiry, no employee at the Bonner Group had a role in writing, editing, or otherwise revising Eric Hananoki's articles about X Corp. published on November 16 and 17, 2023. Similarly, based on a reasonable inquiry, no employee at the Bonner Group wrote, edited, or otherwise revised the remarks Angelo Carusone made on MSNBC on November 26, 2023.

12. It is not the Bonner Group's practice to write or edit pieces of journalism or other website content for Media Matters or for any other client. It is also not the Bonner Group's practice to provide preparatory or consulting services for clients who make public statements, remarks, or appearances except as they relate to fundraising.

13. On July 27, 2026, the Bonner Group was served with a subpoena from X Corp. in connection with *X Corp. v. Media Matters for America*, No. 23 Civ. 1175 (N.D. Tex.) (the "Texas Action"). The subpoena demanded that by August 7, 2026, the Bonner Group produce at "Same Day Process" documents in response to 13 document requests:

i. All documents and communications that concern any of the following: (a) boycotting the Platform; (b) outreach or communications targeted at X's advertisers (or potential advertisers) regarding the Platform; (c) building, coordinating, or participating in any public pressure campaign relating to content moderation on the Platform or aimed at reducing or discouraging advertising on the Platform; or (d) the goals, objectives, strategies, or plans of the Bonner Group or Media Matters concerning any of the matters described in subparagraphs (a) through (c) above.

ii. Documents sufficient to show any events, trainings, videos, conferences, or webinars hosted or circulated by You, Defendants, Media Matters Action Network,

or Unbendable Media LLC concerning (a) X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

iii. All documents concerning (a) X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

iv. All documents and communications concerning any request, solicitation, requirement, or condition (whether formal or informal) that obligates or encourages Defendants to organize, conduct, or participate in: (a) efforts to boycott the Platform or to encourage others, including its advertisers to do so, (b) public pressure campaigns relating to content moderation, ad adjacencies, brand safety, or advertising on the Platform, or (c) efforts aimed at reducing or discouraging advertising on the Platform. This includes any such requests or conditions contained in grant agreements, donation agreements, funding proposals, or similar instruments.

v. Documents sufficient to show the performance, reach, engagement, distribution, or fundraising impact of articles, media appearances, other editorial content, research, or studies published by Defendants concerning [(a)] X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

vi. All documents and communications concerning inquiries received, solicitations made, and grants or donations tracked or reported by the Bonner Group in connection with (i) the Articles, (ii) the Matter, or (iii) any articles, appearances,

Docusign Envelope ID: D1F92D87-8936-81E3-82F1-06EE663EF855

other editorial content, research, or studies published by Defendants concerning (a) X, (b) Elon Musk, or (c) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

vii. All documents and communications concerning reports, updates, certifications, or accounting provided by or on behalf of Defendants to any funder, donor, or intermediary in connection with (i) the Articles, (ii) the Matter, or (iii) any articles, appearances, other editorial content, research, or studies published by Defendants concerning (a) X, (b) Elon Musk, or (c) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.

viii. All contracts, statements of work, or other agreements governing Your engagement or affiliation with Defendants or Media Matters Action Network.

ix. Documents sufficient to show the formation, bylaws, charter, mission, and organizational structure of the Bonner Group, and affiliation with Defendants and Media Matters Action Network.

x. Documents sufficient to identify and describe the roles of Your employees, contractors, board members, or volunteers who provided services or otherwise acted on behalf of Defendants, or Media Matters Action Network.

xi. Documents sufficient to identify all costs, facilities, vendors, or other resources shared between You and Defendants or Media Matters Action Network.

xii. Documents sufficient to show the total number of Media Matters's donors or grantors who at the time of donation or grant award were either: (a) individuals residing in the Northern District of Texas, or (b) entities, including without limitation corporations, partnerships, associations or other organizations or entities,

with a principal place of business, registered office or mailing address in the Northern District of Texas. This request does not seek the name or other personally identifiable information of the donor.

xiii. All Documents concerning Advocacy Campaigns and efforts to aid, participate in, or otherwise support Advocacy Campaigns.

14. The disclosure of the materials requested by the subpoena would reveal vast amounts of information about and communications between the Bonner Group, its clients, its donors, and other like-minded individuals and organizations, including information and communications that all participants intended and expected to remain confidential. That information includes donations, charitable solicitations, personal information about individual donors, messaging intended only for donors and clients, and internal strategy documents. That information relates to activity that the Bonner Group and our partners consider to be inherently expressive, political, and associational, and protected by our rights under the First Amendment.

15. For example, the subpoena requests the disclosure of potential boycotting activity; of building and participating in public pressure campaigns; of the "goal, objectives, strategies, or plans" of the Bonner Group and its clients and donors; of events, trainings, videos, conferences, and webinars that the Bonner Group or its clients may host; of solicitations for donations and communications to and from donors and potential donors to the Bonner Group's clients; of updates and information provided to donors; and of work concerning "Advocacy Campaigns."

16. These requests directly implicate communications, strategies, meetings, and organizing that were intended to advance the political and social objectives of the Bonner Group, its clients, and donors that the participants intentionally kept private. The Bonner Group often uses similar methods of fundraising, communicating, and organizing across different clients and across

different issue areas. The disclosure of those methods would also undermine the effectiveness of the Bonner Group's work and, as a result, the effectiveness of the work by the Bonner Group's clients and donors, going forward.

17. The topics of the subpoena touch directly on issues of political, social, and cultural importance that have been the subject of organizing by the Bonner Group's clients and donors.

18. For example, nearly every request in the subpoena asks for "all" documents or communications "concerning" Elon Musk and the social media platform that he purchased, X. Over the years, many of the Bonner Group's clients and donors have expressed positions about Musk, and many of them have criticized (sometimes, in harsh terms), and organized opposition to, Musk's conduct.

19. Employees at the Bonner Group read and share news stories that may be relevant to their work, to clients, or to donors. These stories sometimes mention X and often come directly from X.

20. As a result, many of the Bonner Group's communications internally, and with donors and clients, likely mention or otherwise "concern" Musk or his company X, but do not relate to the issues that I understand to be in dispute in the Texas Action. These communications would involve many of the Bonner Group's clients and donors who have no connection to Media Matters or to the Texas Action.

21. Given Musk's policial positions, historic political donations, and prior government office, many of these communications would include overtly political discussions, including discussions regarding campaigns and campaign platforms, political candidates, policy issues, pending legislation on certain topics, and the current Presidential Administration. The Bonner Group regularly corresponds with clients and donors on such topics.

22. The subpoena's request for information about the Bonner Group's contracts, agreements, formation, bylaws, charter, organizational structure, employees, contractors, volunteers, facilities, vendors, and resources also seeks information that is confidential and is important to the Bonner Group's work. The Bonner Group does not publicize its structure or the names of its employees and vendors and volunteers. Because of the nature of the Bonner Group's political work, some employees choose to minimize their public profile for fear of retaliation or public harassment.

23. If the information demanded by the subpoena is disclosed, it will have a significant chilling effect on the Bonner Group's work, and on the participation of the Bonner Group's clients and donors.

24. If work with the Bonner Group is no longer private, many donors will choose to no longer engage with and support the clients of the Bonner Group.

25. Further, some of the information requested in the subpoena may be contained in emails or other correspondence that also includes personal donor information. The Bonner Group regularly collects donors' and potential donors' personal information to facilitate its fundraising efforts. This personal information can include contact information, home addresses, and even bank account information. This information is shared in emails and documents among Bonner Group employees. These emails are likely to include some of the topics named in the subpoena.

26. If the Bonner Group's relationships with donors are harmed, many clients will choose to no longer work with the Bonner Group. Losing clients would cause reputational harm to the Bonner Group and would cause the Bonner Group serious financial hardship.

27. If the Bonner Group's internal and external communications were disclosed, that disclosure would also have a chilling effect on what the Bonner Group's employees say to each

other, to clients, and to donors. For example, Bonner Group employees sometimes share personal experiences or viewpoints with clients or donors when discussing and raising funds for specific causes. Bonner Group employees may be hesitant to do so in future communications if they are concerned that their communications could be disclosed in litigation.

28. The Texas Action has already had a chilling effect on the speech of the Bonner Group's employees. Most employees at the Bonner Group are aware of the Texas Acton and of the harassment that Media Matters employees have faced as a result of that dispute, including that Media Matters employees have received threatening messages and that Media Matters had to retain additional security for the safety of its employees. In light of what Media Matters employees have faced, this subpoena has caused fear among employees of the Bonner Group, including fear of communicating about issues that they think may fall within the scope of the subpoena because they do not want their communications to be disclosed.

29. The Texas Action has also already chilled donations to Media Matters. Our understanding is that some donors have stopped donating to Media Matters because they do not want their identity to be disclosed. Donors do not want to be subject to harassment or are otherwise afraid that their communications regarding Media Matters will be released in litigation. Some donors are also aware that Musk has threatened Media Matters's donors with litigation and have stopped donating to Media Matters because they do not want to involved in litigation or a government investigation.

30. This litigation has also already put a financial strain on the Bonner Group, including because the Bonner Group had to hire attorneys to prepare this motion. I understand that compliance with the subpoena would be expensive, therefore causing additional financial strain. This includes because responding to the subpoena would require the Bonner Group to retain

outside counsel to collect, review, and produce documents in response to the subpoena. The Bonner Group does not have in-house counsel on its staff.

31. If the Bonner Group loses donors or clients because of the subpoena, that would also cause the company significant financial hardship.

32. Responding to this subpoena would also take time. Typically, the Bonner Group's busiest time of year is in the fall, around election season. This is because many of the Bonner Group's clients are political organizations who have significant fundraising needs before their elections. The Bonner Group's staff expects to be busy over the next few months. Responding to this subpoena would be a hardship and would be place a burden on our employees.

33. For each of these reasons, responding to the subpoena would be extremely burdensome.

34. I declare under penalty of perjury that the foregoing is true and correct.

Signed by:
Allison Thompson
156012 76E1FA41D...

Dated: September 14, 2026
Washington, DC

Allison Thompson